312 Ga. 495
FINAL COPY

S21A0829.  WASHINGTON v. THE STATE.

MCMILLIAN, Justice.

Brantley Washington and his co-defendants, Chrishon Siders and Haleem Graham, were convicted of malice murder, first degree burglary, and other crimes in connection with the shooting death of Seine Yale Jackson.[1] Washington appeals, asserting that the trial

---

[1] The crimes occurred on January 6, 2016. On May 17, 2016, a Fulton County grand jury indicted Washington, Siders, and Graham on charges of participation in criminal street gang activity (Count 1), malice murder (Count 2), felony murder (Counts 3-7), first degree home invasion (Count 11), aggravated assault with a deadly weapon (Count 12), false imprisonment (Count 13), first degree burglary (Count 14), and possession of a firearm during the commission of a felony (Count 15). The grand jury separately indicted Siders and Graham on charges of possession of a firearm by a convicted felon (Counts 16-18) and felony murder predicated on those felonies (Counts 8-10). At a joint trial held from February 19 to 28, 2019, the jury found Washington guilty of Counts 2-6 and 11-15. The jury also found Siders guilty of Counts 2-6, 10-15, and 18 and Graham guilty of Counts 3-6, 8 and 9, and 11-17; their convictions are not at issue in this appeal. The trial court nolle prossed Counts 1 and 7. On March 1, 2019, the trial court sentenced Washington to serve life in prison without the possibility of parole for malice murder, life in prison for first degree home invasion, ten years in prison for false imprisonment, and five years in prison for possession of a firearm during the commission of a felony, all to run consecutively. The aggravated assault count merged with the malice murder conviction, and the first degree burglary count merged with the first

court erred in admitting hotel surveillance videos from the day before and the day of the crimes, along with the opinion testimony of two detectives describing the surveillance videos and a dashcam video recording of a traffic stop taken on the night of the crimes. Washington also claims that he received ineffective assistance of counsel when his trial counsel failed to object to that evidence. Discerning no error, we affirm Washington's convictions.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that at approximately 1:57 a.m. on January 6, 2016, police officers responded to a call of shots fired at a rental unit behind a house on Glen Iris Drive in Fulton County. The responding officers found Jackson dead; he had been gagged with a belt and necktie, "hog-tied" with extension cords, and shot in

degree home invasion conviction; the remaining felony murder counts were vacated by operation of law. Washington timely filed a motion for new trial on March 4, 2019, which he amended through new counsel on February 4, 2020. The trial court conducted a joint hearing on the defendants' motions for new trial on November 2, 2020, and a separate hearing on November 13, 2020, related only to Washington. On January 27, 2021, the trial court denied Washington's motion for new trial, as amended, and Washington timely appealed. The case was docketed in this Court to the April 2021 term of court and submitted for a decision on the briefs.

2

the back of the head. Investigation at the scene showed no signs of forced entry, but the apartment appeared to have been ransacked. Officers collected an empty clear jar emitting the odor of fresh marijuana. Later GBI testing of the jar found a fingerprint match for Washington. An autopsy revealed that Jackson suffered wounds consistent with being bound and gagged and had died from any one of four fatal gunshots to the head.

The day before the shooting, Washington, Siders, and Graham arrived together at a Best Western hotel in Walterboro, South Carolina[2] around 1:28 p.m. in a red Pontiac Grand Prix. Hotel surveillance video recordings depicted the vehicle entering the parking lot and three individuals, identified by Detective Scott Berhalter as Washington, Siders, and Graham, exiting the car. Additional video recordings showed the car leaving the parking lot around 8:21 p.m. that evening. Chris Treadwell, a Taliaferro

---

[2] The hotel is 249 miles from Glen Iris Drive, with a drive time of approximately four hours and twelve minutes.

County[3] sheriff's deputy, testified that he conducted a traffic stop on a red Pontiac Grand Prix with South Carolina tags around 11:27 p.m. as it headed to Atlanta and cited Graham, who was driving, for speeding. Two other men were in the vehicle.

Meyonta Murphy testified that she visited her mother, who lived in another rental unit on the same property on Glen Iris Drive, at approximately 1:45 a.m. on January 6, 2016. When she arrived, she noticed an unfamiliar red Pontiac idling in front of the house with two people inside. As she left her mother's apartment about ten minutes later, Murphy passed a man walking up the driveway toward the house. Murphy took note of the vehicle's South Carolina license plate number before she left. Shortly thereafter, Murphy's mother heard nearby gunshots and called 911. Murphy later told investigating officers about her observations of the red Pontiac and the man she encountered, whom she later identified in a photographic lineup as Siders.

---

[3] Taliaferro County is approximately 90 miles east of Atlanta along Interstate 20.

Jackson's brother testified that Siders was always asking Jackson to "front" him drugs without payment, but Jackson continued to do business with him because Siders was related to Jackson's uncle. Jackson's friend, Marc Huewitt, testified that Jackson visited him around 6:00 p.m., just hours before Jackson was shot. Jackson mentioned that he was planning to meet with a man related to his uncle later that evening and was "very concerned" because he had a bad feeling about the man.

Detective Scott Demeester, who was qualified as an expert in cell phone data interpretation and cell-site analysis, testified regarding data recovered from the defendants' cell phones. A cell phone associated with Washington called and texted Jackson's cell phone several times in the days leading up to the shooting. At 6:39 p.m. on January 5, Washington texted an unidentified phone number, stating, "This Brantley. Call me asap. I'm ready to buy that thing back from you. I got the money." When Washington called Jackson around 7:45 p.m. that evening, Washington was near the Best Western hotel before leaving shortly thereafter and traveling

in a northwestern direction. At 11:23 p.m., Siders's cell phone was near Taliaferro County, approximately two hours and thirty minutes from the Best Western. At 11:45 p.m., Washington's cell phone sent a text to Jackson, stating, "Got a speeding ticket lol." When Washington called Jackson at 1:08 a.m., Washington's cell phone was near Glen Iris Drive. That call was the last call ever made on Washington's cell phone. After that point, the cell phone remained stationary near Interstate 20 in DeKalb County and received numerous calls that went unanswered, consistent with having been "dumped" out of a vehicle. Siders's and Graham's phones placed various calls to each other between 1:10 and 1:48 a.m. while they were in the area of Glen Iris Drive. Approximately one hour after the shooting was reported, Siders's cell phone was on Interstate 20, heading east away from Atlanta. The next time Graham's and Siders's cell phones were used was in Walterboro on the morning of January 6.

Additional hotel surveillance video showed that the Pontiac entered the Best Western parking lot at 6:20 a.m. on the morning

6

after the shooting. Although the video did not show who exited the car, it did show three men unload what appeared to be heavy bags from the Pontiac. At 8:01 a.m., the three men returned to the car and left the hotel. The car then returned at 9:56 a.m. before leaving for the final time at 10:01 a.m. The State also introduced a receipt showing that Graham had checked into a room at the Best Western hotel around 1:28 p.m. on January 5, 2016, and checked out at 10:00 a.m. the following morning.

Siders, the only defendant to testify at trial, told the jury that he knew Jackson through his cousin and that he used to purchase drugs from Jackson. Siders also testified that he and Washington were part of a musical group that Graham managed and that they met in South Carolina on January 5, 2016, to work in a music studio. That evening, they decided to drive to Atlanta for a promotional photo shoot, but Washington stayed at the hotel because he became ill with "flu-like symptoms . . . throwing up all over the place." According to Siders, while he and Graham were in Atlanta, he called Jackson to buy "some smoke," but Huewitt answered Jackson's

7

phone and told him to come to Jackson's house. When Siders arrived at Jackson's address, he found Huewitt outside and told him that he wanted "an eighth." Huewitt responded, "An eighth? Man, I thought you wanted some weight. We don't got no eighth," before walking away. Siders testified that he then returned to the car and told Graham that Huewitt was "acting really funny just now," and they went to a nearby club where they stayed for a short while before returning to South Carolina.[4]

---

[4] Although not separately enumerated as error, Washington nonetheless argues the sufficiency of the evidence in the body of his appellate brief. To the extent Washington has properly challenged the sufficiency of the evidence, we are unpersuaded. When evaluating the sufficiency of the evidence under the Fourteenth Amendment to the United States Constitution, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted). We conclude that the evidence presented at trial was sufficient to authorize a rational jury to find Washington guilty beyond a reasonable doubt at least as a party to the crimes for which he was convicted. See OCGA § 16-2-20 (defining parties to a crime); *Shealey v. State*, 308 Ga. 847, 850 (1) (843 SE2d 864) (2020) (affirming convictions where there was ample evidence from which the jury could find that appellant aided, abetted, and encouraged the crimes and shared a common criminal intent with those who shot the victim).

1. Washington asserts that the trial court erred by admitting surveillance videos from the Best Western without proper authentication or foundation. He concedes that, because this evidence was admitted at trial without objection, we review this claim only for plain error. See *Gates v. State*, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016); OCGA § 24-1-103 (a), (d).

To establish plain error, an appellant must meet each prong of a four-prong test:

> [F]irst, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised if only the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Lewis v. State*, 311 Ga. 650, 664 (4) (859 SE2d 1) (2021) (citation, punctuation and emphasis omitted). As we have noted, affirmatively

establishing all four prongs "is a difficult standard to satisfy." Id. at 665 (4) (citation and punctuation omitted).

Here, Washington urges that the State's use of a business record certification was not sufficient to authenticate the surveillance videos and that the trial court therefore committed plain error by admitting the evidence without further authentication. However, Washington is unable to satisfy the first prong of the plain error test. In his opening statement at trial, Washington's counsel admitted that his client was at the Best Western hotel and explained that the State would probably introduce surveillance footage showing that Washington was there, but claimed that the State would not be able to show that Washington was at or near the scene of the crime. This opening statement was consistent with Washington's defense theory — that he went to the hotel in South Carolina but did not travel with his co-defendants to Atlanta — and with Siders testimony that Washington stayed behind at the hotel when he and Graham went

10

to Atlanta because Washington was ill.[5]

In evaluating the first prong of the plain error test, a strategic decision to refrain from objecting may constitute "the equivalent of an affirmative waiver." *Griffin v. State*, 309 Ga. 860, 865 (2) (849 SE2d 191) (2020) ("[T]he appellate court can conclude that the defendant intentionally relinquished or abandoned a known right if the appellate court can discern a tactical reason on the part of the defense for failing to take appropriate action to preserve that right." (citation and punctuation omitted)). Based on the circumstances of this case, it is clear that Washington strategically and intentionally refrained from objecting to the admission of the surveillance video and instead sought to incorporate it into his defense theory. Thus, Washington intentionally relinquished any claim that the trial court erred in admitting this evidence, and this claim of error fails.[6]

---

[5] See Division 3 (a) below for further discussion of trial counsel's strategy in this regard.

[6] Because Washington is required to satisfy each prong of the plain error test, we need not address whether this claim also fails under the other prongs. See *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020) ("The Court need not analyze all of the elements of the plain-error test when the appellant fails to establish one of them.").

11

2. Washington also asserts that the trial court erred by admitting the detectives' opinion testimony identifying Washington (a) in the Best Western surveillance videos and (b) in the traffic stop dashcam video. Because trial counsel did not object at trial, Washington concedes that we also review these claims for plain error. See *Gates*, 298 Ga. at 327 (3).

(a) Detective Berhalter testified that when he initially contacted personnel at the Best Western hotel, they would not provide information over the phone, so he involved the local county sheriff's office, which was able to obtain the room bill, form of payment, and several hours of surveillance recordings from around the property. Detective Berhalter explained that he then pored over this evidence, which helped lead to the identification of Siders and, eventually, Graham and Washington through various social media searches. Detective Berhalter then described for the jury a portion of the surveillance videos in which he identified each of the three defendants exiting a Pontiac and entering the hotel at 1:28 p.m. on

12

the day before the murder. [7] Detective Berhalter also testified that when the Pontiac left the hotel later that evening, the surveillance videos did not show who was in the vehicle and that, when the Pontiac returned to the hotel the following morning, the surveillance videos did not record the occupants exiting the vehicle, although it did show three individuals removing baggage from the vehicle.

For the same reasons stated in Division 1 above, Washington cannot establish the first prong of the plain error test with respect to this testimony, and this enumeration of error therefore fails. See *Griffin*, 309 Ga. at 865 (2).

(b) Prior to trial, Washington's trial counsel filed a motion in limine to exclude "improper opinion testimony or argu[ment] that [Washington] was present in a vehicle stopped by a law enforcement officer in Taliaferro County, Georgia, that was bound for the victim's residence in Atlanta, Georgia, on the night of the alleged homicide."

---

[7] Detective Demeester never identified Washington in the Best Western surveillance videos at trial; therefore, to the extent Washington argues that the trial court erred in admitting such testimony, that argument necessarily fails.

13

The trial court denied the motion. At trial, Detective Berhalter testified about the course of his investigation, including his review of the dashcam video. He explained that, after rewatching the dashcam video later in his investigation, he determined that there were three individuals in the Pontiac at the time it was stopped in Taliaferro County. However, he did not identify Washington as the third person in the vehicle with Siders and Graham. Detective Demeester also testified that he reviewed the dashcam video and believed that there were three people in the vehicle, including a passenger who was smoking in the back seat. However, again, the transcript clearly shows that Detective Demeester did not opine that the video depicted Washington in the vehicle.[8]

Because neither detective identified Washington and

---

[8] We note that neither of the detectives' testimony falls within the confines of Washington's motion in limine; in the absence of a separate contemporaneous objection, our review of this claim is limited to plain error review. See *Williams v. Harvey*, 311 Ga. 439, 452 (2) (858 SE2d 479) (2021) ("Although a party does not waive an error by failing to object to admission of evidence after a motion in limine is denied, this rule cannot be invoked to preserve a different, if perhaps related, error. To allow such a procedure would deprive the trial court of the opportunity to consider the error alleged, and take corrective action, if necessary." (citation and punctuation omitted)).

14

Washington's argument on appeal is that the trial court erroneously permitted opinion testimony identifying him, Washington cannot establish error, much less plain error, and this claim fails.[9] See *Thornton v. State*, 307 Ga. 121, 124-25 (2) (b) (834 SE2d 814) (2019) (where appellant's claim is directly contradicted by the record, appellant is unable to show error, much less plain error).

3. Washington claims that his trial counsel provided ineffective assistance by failing to object to (a) the admission of the hotel surveillance videos and (b) the detectives' opinion testimony as to the identity of Washington on the surveillance and dashcam videos. To prevail on these claims, Washington must show that his trial counsel's performance was deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466

---

[9] To the extent that Washington argues more generally that the trial court committed plain error in allowing the detectives to "narrate" the dashcam video, we are not persuaded. The transcript shows that the detectives did not narrate the approximately eight-minute video. Rather, the detectives explained what portion of the video led them to believe there were three individuals in the vehicle at the time of the stop.

15

U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Washington must establish that counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Middlebrooks v. State*, 310 Ga. 748, 751 (3) (854 SE2d 503) (2021) (citation and punctuation omitted). In doing so, Washington "must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct." *Moore v. State*, 306 Ga. 532, 536 (3) (832 SE2d 384) (2019) (citation and punctuation omitted).

(a) As discussed above in Division 1, trial counsel made a strategic decision not to object to the surveillance videos. At the motion for new trial hearing, trial counsel testified that he did not object to the admission of the hotel surveillance videos because "the main part of [his] strategy in representing [Washington] was to establish that he was at the hotel and never left the hotel, and the videos would have shown his presence on the premises." This strategy was evident from trial counsel's opening statement that the

16

State would not be able to show that Washington left the hotel with Siders and Graham when they went to Atlanta, a strategy that remained consistent throughout the trial. On cross-examination, trial counsel elicited testimony from Siders that Washington did not travel to Atlanta with him and Graham because Washington was ill and had stayed at the hotel. During closing argument, trial counsel argued that the jury should believe Siders's testimony and should therefore find that Washington was not guilty.

Although the hotel surveillance videos also show that Washington was with Siders and Graham during the afternoon before and the morning after the shooting, that evidence was cumulative of other admissible evidence, including Siders's testimony and cell-site location data from the cell phone associated with Washington. Accordingly, we cannot say that the strategy to use the surveillance videos and not object to them was unreasonable, and, thus, Washington is unable to show that his trial counsel's performance was constitutionally deficient. See *Griffin*, 309 Ga. at 867 (3) (withholding objection to allow evidence that supports

17

defense theory is a reasonable trial strategy and does not amount to ineffective assistance of counsel).

(b) For the reasons stated above in Division 2 (b), to the extent Washington alleges trial counsel should have objected to the detectives' identification of Washington on the dashcam video, he cannot show either deficient performance or prejudice because neither detective identified Washington as the third person in the vehicle.

To the extent Washington argues more generally that trial counsel was constitutionally deficient in failing to object to the detectives' testimony regarding the presence of a third person in the vehicle on the ground that it was impermissible opinion testimony, we are not persuaded. At the motion for new trial hearing, trial counsel testified that he could not recall why he did not object to the detectives' testimony regarding the dashcam video, but he believed that he cross-examined Detective Berhalter "pretty strongly" because he had previously testified under oath at a preliminary hearing that there were only two people in the vehicle. Trial counsel

also raised the issue during cross-examination of Deputy Treadwell, who conducted the traffic stop, because the deputy's original report said there were only two people in the traffic stop. In addition, trial counsel explained that he challenged the credibility of Detective Demeester after the detective admitted that, before he rewatched the video, he had been told by Detective Berhalter that there was a third person in the vehicle. The trial transcript supports trial counsel's testimony and further shows that trial counsel also attempted to otherwise shed doubt on the detectives' testimony, including by challenging their visual capabilities and the quality of the video.

In evaluating the reasonableness of trial strategy, every effort should be made "to eliminate the distorting effects of hindsight." *Davis v. State*, 306 Ga. 140, 144 (3) (829 SE2d 321) (2019) (citation and punctuation omitted). "Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." Id. Counsel's decision to forgo an objection to testimony in favor of impeaching a witness or showing

19

inconsistencies in the evidence is a matter of trial strategy and, if reasonable, will not support an ineffectiveness claim. See *Koonce v. State*, 305 Ga. 671, 673 (2) (b) (827 SE2d 633) (2019). We conclude that trial counsel's decision here was not patently unreasonable, and this claim therefore fails.

*Judgment affirmed. All the Justices concur.*

Decided September 21, 2021.

Murder. Fulton Superior Court. Before Judge Millender.

*Christina M. Kempter*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Burke O. Doherty, Juliana Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.